UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STEPHEN F. PITTS,

Applicant,

v. CASE NO. 8:23-cv-2805-SDM-AAS

SECRETARY, Department of Corrections,

Respondent.
_______________________________________/

**ORDER**

Pitts applies under 28 U.S.C. § 2254 for the writ of habeas corpus (Doc. 1) and challenges his convictions for burglary of an unoccupied dwelling and possession of burglary tools, for which he is imprisoned for twenty-four years. Numerous exhibits ("Respondent's Exhibit __") support the response. (Doc. 8) The application asserts five grounds for relief, each of which is meritless.

## I. BACKGROUND

In May 2014, law enforcement placed a GPS tracker on Pitts's Chevrolet Malibu as part of an investigation into a string of residential burglaries. (Respondent's Exhibit 1 at 222–23, 231, 473; Respondent's Exhibit 1a at 168, 170–72) On May 6, Pitts and Raymond Corso drove the Malibu south toward Venice as deputies followed the car. (Respondent's Exhibit 1a at 278–80, 497–99) According to Corso, the two planned to "take belongings" from "vacant homes." (Respondent's Exhibit 1a at 497) In a residential area of Venice, Pitts got out of the

car with a black backpack and told Corso to "[w]ait for his phone call." (Respondent's Exhibit 1a at 499–501) Corso drove to McDonald's and bought food. (Respondent's Exhibit 1a at 348, 501) A deputy looked inside the parked Malibu and saw no "large objects" apart from a "child's car seat." (Respondent's Exhibit 1a at 347)

Meanwhile, a detective heard "what sounded like glass breaking" near Wexford Drive. (Respondent's Exhibit 1a at 312–13) At 511 Wexford, the rear sliding door was shattered, and pieces of glass "were still dropping onto the ground." (Respondent's Exhibit 1a at 315–16) Deputies found a "broken" sliding door at 506 Wexford and "a television . . . in the side yard." (Respondent's Exhibit 1a at 317, 451) At 519 Wexford, the screen "had been slit" but the sliding door "did not appear to be breached." (Respondent's Exhibit 1a at 317)

After receiving Pitts's call, Corso returned to the residential area and found Pitts with two televisions and the backpack. (Respondent's Exhibit 1a at 502–03) Pitts and Corso drove north on Interstate 75, and deputies stopped the Malibu for "going over the speed limit." (Respondent's Exhibit 1a at 390–97, 504) A deputy saw two televisions and a Blu-ray player on "the back seat of the vehicle." (Respondent's Exhibit 1a at 397) Pitts told the deputy that he had "moved out of his house in Bradenton and . . . was on his way to his father's house in Sarasota." (Respondent's Exhibit 1a at 397) Another deputy recovered coins in a "little coin folder" from Pitts's back pocket. (Respondent's Exhibit 1a at 381)

Pitts's backpack was on the back seat of the Malibu. (Respondent's Exhibit 1a at 448, 503, 522) The backpack contained a "digital camera" and its manual. (Respondent's Exhibit 1a at 448, 451–52) The owner of 511 Wexford recognized both items. (Respondent's Exhibit 1a at 263–65) The recovered camera contained photographs of his "family," and his "wife had written her name and telephone number on the owner's manual." (Respondent's Exhibit 1a at 265, 272–73) Also, he recognized his "presidential coins" and other currency among the items recovered from Pitts's pocket and backpack. (Respondent's Exhibit 1a at 264, 266–68, 381–82, 452–53) The owner of 506 Wexford identified the two televisions and the Blu-ray player. (Respondent's Exhibit 1a at 241, 246–50) She explained that the serial numbers matched her "records." (Respondent's Exhibit 1a at 249–50) The owners of both houses denied giving Pitts permission to enter. (Respondent's Exhibit 1a at 250, 269)

A tool known as a "glass punch" was recovered from the center console of the Malibu. (Respondent's Exhibit 1a at 443) A glass fragment in Pitts's backpack matched the "characteristics" of glass from 506 Wexford's shattered sliding door. (Respondent's Exhibit 1a at 477, 479) A forensic analyst explained that glass from an unrelated source was "somewhat unlikely" to share those characteristics. (Respondent's Exhibit 1a at 477) The analyst could not identify "one specific window" as the source or say when the fragment entered the backpack. (Respondent's Exhibit 1a at 480–81)

Pitts was charged with two counts of burglary of an unoccupied dwelling, one count of attempted burglary, and one count of possession of burglary tools. (Respondent's Exhibit 1 at 119) A jury found Pitts guilty as charged.[1] (Respondent's Exhibit 1a at 679–80) The trial court granted Pitts's motion for judgment of acquittal on the attempted-burglary count. (Respondent's Exhibit 1a at 682) Pitts received a total sentence of twenty-four years' imprisonment for the remaining counts. (Respondent's Exhibit 1a at 688–89) The appellate court affirmed the convictions without a written opinion. (Respondent's Exhibit 4) Pitts unsuccessfully moved for post-conviction relief under Florida Rule of Criminal Procedure 3.850. (Respondent's Exhibits 11, 14) This federal habeas application followed. (Doc. 1)

## II. STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Wilcox v. Fla. Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998). Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[1] Corso testified at trial as a witness for the prosecution.

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied — the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable[;] . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). *See White v. Woodall*, 572 U.S. 415, 427 (2014) ("The critical

point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question . . . ."); *Woods v. Donald*, 575 U.S. 312, 316 (2015) ("And an 'unreasonable application of' those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (citing *Woodall*, 572 U.S. at 419). *Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide."). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case. "[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell*, 535 U.S. at 694. A federal court must afford due deference to a state court's decision. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *See also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim explains its decision in a

reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[A] federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable."). When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192.

In *per curiam* decisions without written opinions, the appellate court affirmed Pitts's convictions and affirmed the denial of his Rule 3.850 motion for post-conviction relief. The appellate court's *per curiam* decisions warrant deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). *See also Richter*, 562 U.S. at 100 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."), *and Bishop v. Warden*, 726 F.3d 1243, 1255–56 (11th Cir. 2013) (describing the difference between an "opinion" or "analysis" and a "decision" or "ruling" and explaining that deference is accorded the state court's "decision" or "ruling" even absent an "opinion" or "analysis").

As *Pinholster* explains, 563 U.S. at 181–82, review of the state court decision is limited to the record that was before the state court:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court.

Pitts bears the burden of overcoming by clear and convincing evidence a state court's fact determination. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001).

## III. TRIAL COURT ERROR

**Ground One:**

Pitts contends that the trial court violated the Confrontation Clause by restricting his cross-examination of Deputy James Dilling. (Doc. 1 at 19) Dilling and Sergeant Matt Tuggle conducted the traffic stop of the Chevrolet Malibu after the burglaries. (Respondent's Exhibit 1a at 382–83) Dilling was the "backup officer" during the stop. (Respondent's Exhibit 1a at 383) Tuggle stopped the Malibu for speeding and approached Pitts on the "driver's side." (Respondent's Exhibit 1a at 395–96) Dilling approached Corso on the "passenger side." (Respondent's

Exhibit 1a at 358–59) After learning from "other deputies" about the burglaries on Wexford Drive, Dilling arrested Pitts and found coins in his "rear left pocket," packaged in "little . . . plastic sleeves." (Respondent's Exhibit 1a at 380–81)

During the trial, Dilling was under investigation for providing false deposition testimony in an unrelated criminal case. (Respondent's Exhibit 1a at 376) The "misstatements" were "designed to protect the existence of a confidential informant." (Respondent's Exhibit 1a at 376) Defense counsel requested to ask whether Dilling had "ever taken an oath to tell the truth and lied after taking the oath." (Respondent's Exhibit 1a at 377) The trial court barred the inquiry because Dilling had not been criminally charged for perjury, the proposed questions "would be impeachment on a collateral matter," and the jury would find the testimony "confusi[ng]." (Respondent's Exhibit 1a at 376–78)

Pitts argues that the court violated his right of confrontation by excluding "testimony that [Dilling] was previously untruthful under oath and was under investigation for perjury." (Doc. 1 at 21) Pitts is entitled to no relief because he cannot show that the exclusion of this testimony caused "actual prejudice."[2] *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). State prisoners "are not entitled to habeas relief based on trial error unless they can establish that [the error] resulted in actual prejudice." *Brecht*, 507 U.S. at 637. "To show prejudice under *Brecht*, there must be

---

[2] Because the claim fails for lack of prejudice, the district court does not address the respondent's contention that the claim is unexhausted. *See Castillo v. Sec'y, Fla. Dep't of Corr.*, 2024 WL 2873904, at *5 (11th Cir. June 7, 2024) (declining to "address the state's argument that [the] claim is unexhausted" because petitioner "failed to show actual prejudice" as "required by *Brecht*").

more than a reasonable possibility that the error contributed to the conviction." *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1114 (11th Cir. 2012). "Whether such an error was harmless may depend on, among other things, the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Al-Amin v. Warden Ga. Dep't of Corr.*, 932 F.3d 1291, 1302 (11th Cir. 2019).

Pitts cannot show actual prejudice because even without Dilling's testimony, the prosecution presented "overwhelming" evidence of guilt. *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1313 (11th Cir. 2012). Tuggle independently identified Pitts as the driver of the Malibu, saw the televisions and the Blu-ray player "in the back seat of the vehicle," and heard Pitts claim that he had "moved out of his house in Bradenton and . . . was on his way to his father's house in Sarasota." (Respondent's Exhibit 1a at 396–97) Thus, the essential testimony about the traffic stop would have remained intact even if counsel had impeached Dilling with the alleged perjury. *See Gover v. Perry*, 698 F.3d 295, 303 (6th Cir. 2012) (holding that a Confrontation Clause violation was harmless because the challenged testimony was "cumulative of the testimony of others").

To be sure, Tuggle did not testify that he saw the coins Dilling recovered from Pitts's pocket. (Respondent's Exhibit 1a at 396–407) These coins had been taken from 511 Wexford. (Respondent's Exhibit 1a at 264, 266–68, 381–82, 452–53) But

other evidence independently connected Pitts to the burglary of 511 Wexford. After the stop, other investigators searched the Malibu under a warrant and recovered a digital camera and its manual. (Respondent's Exhibit 1a at 448, 451–52) The owner of 511 Wexford recognized both items. (Respondent's Exhibit 1a at 263–65) The recovered camera contained photographs of his "family," and his "wife had written her name and telephone number on the owner's manual." (Respondent's Exhibit 1a at 265, 272–73)

Likewise, evidence independent of Dilling linked Pitts to the burglary of 506 Wexford. The owner of 506 Wexford identified the two televisions and the Blu-ray player recovered from the Malibu. (Respondent's Exhibit 1a at 241, 246–50) She explained that the serial numbers matched her "records." (Respondent's Exhibit 1a at 249–50) Moreover, a glass fragment in Pitts's backpack matched the "characteristics" of glass from 506 Wexford's shattered sliding door. (Respondent's Exhibit 1a at 477, 479) A forensic analyst explained that glass from an unrelated source was "somewhat unlikely" to share those characteristics. (Respondent's Exhibit 1a at 477)

Corso corroborated this evidence at trial. According to Corso, he and Pitts set out to "take belongings" from "vacant homes." (Respondent's Exhibit 1a at 497) Corso dropped Pitts off in a residential area, drove to McDonald's, and returned to find Pitts with two televisions and a backpack. (Respondent's Exhibit 1a at 499–503) Law enforcement saw Corso alone at McDonald's before the pickup, and Tuggle saw the electronics in the car afterward. (Respondent's Exhibit 1a 344–47, 396–97)

None of this corroborating evidence turned on Dilling's credibility. *See Mansfield*, 679 F.3d at 1313 (explaining that an error is "likely to be harmless under the *Brecht* standard when there is significant corroborating evidence").

Because ample evidence established Pitts's guilt even without Dilling's testimony, Pitts cannot show "more than a reasonable possibility" that the excluded impeachment "contributed to the conviction[s]."[3] *Trepal*, 684 F.3d at 1114.

**<u>Ground Two:</u>**

Pitts contends that the trial court violated the Confrontation Clause by allowing Kathy MacLean, the owner of 506 Wexford, to testify from Canada by two-way video. (Doc. 1 at 25–27) Defense counsel initially "stipulated" to the procedure, but Pitts "raised an objection." (Respondent's Exhibit 1 at 392) As a result, the trial court held a hearing on MacLean's health and ability to travel. (Respondent's Exhibit 1 at 377)

MacLean, then fifty-nine years old, testified that she had been "diagnosed with osteoarthritis" and "had a hip replaced." (Respondent's Exhibit 1 at 381, 384) Also, MacLean had undergone a "hysterectomy," suffered a "prolapsed bladder," and scheduled an appointment with a surgeon to address "incontinence." (Respondent's Exhibit 1 at 381) Her "sciatica and back issues" required "five injections every three months," and she was concerned that an appointment could be

---

[3] As noted above, Pitts was convicted of possession of burglary tools. This conviction did not depend on Dilling's testimony. The warrant search of the Malibu uncovered the "glass punch" from the center console. (Respondent's Exhibit 1a at 443) The broken sliding doors and the stolen property provided strong circumstantial evidence that the tool was used for the burglaries on Wexford Drive.

canceled if the surgeon was "called to an emergency." (Respondent's Exhibit 1 at 381) Additionally, MacLean cared for her widowed, sixty-three-year-old brother. (Respondent's Exhibit 1 at 384) He had "broken his foot badly," experienced unexplained leg swelling, and required "somebody to be there with him or to drive him somewhere." (Respondent's Exhibit 1 at 384)

After hearing this testimony, the court found that travel would "result in a significant hardship" and allowed MacLean to testify at trial by two-way video. (Respondent's Exhibit 1 at 393) The court explained that "to require [MacLean] to travel for essentially ten minutes of testimony, when she [could] not even identify the defendant, . . . would be extremely unreasonable." (Respondent's Exhibit 1 at 392–93) In the court's view, the situation presented "a perfect example of why teleconferencing exists, why it should be used." (Respondent's Exhibit 1 at 392) At trial, MacLean testified remotely from Canada in accordance with the court's description: "[Y]ou can see her, she can see you, the jury can see her," and "everybody can see everybody basically." (Respondent's Exhibit 1 at 372–73; Respondent's Exhibit 1a at 238, 242)

Pitts contends that "the facts of this case simply did not warrant depriving [him] of his constitutional right to face-to-face physical confrontation." (Doc. 1 at 26) He raised the same argument on direct appeal, and the appellate court affirmed in an unexplained decision. (Respondent's Exhibit 2 at 13–14; Respondent's Exhibit 4)

Pitts is entitled to no relief because he cannot show that the rejection of his

Confrontation Clause claim was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[4] 28 U.S.C. § 2254(d)(1). "'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014). Accordingly, "it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009); *see also Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1288 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer — that is, a holding by the Supreme Court — about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law.").

Pitts cannot meet this standard because "there is no well-settled Supreme Court precedent dealing with testimony given by way of two-way (as opposed to one-way) closed circuit television." *Jones v. Warden, Lebanon Corr. Inst.*, 2016 WL 5242961, at *5 (S.D. Ohio Sept. 22, 2016), *adopted by* 2016 WL 6441419 (S.D. Ohio Nov. 1, 2016). Pitts argues that under *Maryland v. Craig*, 497 U.S. 836 (1990), the

---

[4] Contrary to the respondent's assertion, this claim is exhausted. (Doc. 7 at 21) Before trial, Pitts argued that MacLean's video testimony would violate his right to "confront his witness." (Respondent's Exhibit 1 at 372) On appeal, Pitts contended that MacLean's video testimony violated the Sixth Amendment because her "reasons for not appearing were not life-threatening or of such a deficiency [as] to preclude travel." (Respondent's Exhibit 2 at 13–14) These assertions alerted the state court "to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

trial court "failed to make the appropriate findings as to whether public policy necessitated . . . MacLean's absence." (Doc. 1 at 26) But *Craig* involved a six-year-old girl testifying in a child abuse case via a *one-way* closed circuit television. 497 U.S. at 840. The testifying child in *Craig* "never saw the defendant (in person or via a video monitor) when she testified." *Fuster-Escalona v. Fla. Dep't of Corr.*, 170 F. App'x 627, 629 (11th Cir. 2006). Here, by contrast, MacLean testified via a two-way video that enabled her to see and respond to those in the courtroom, and vice versa. Because "the Supreme Court has not addressed the permissibility of two-way video testimony," Pitts cannot show that the rejection of his Confrontation Clause claim violated clearly established law. *Slivienski v. Corey*, 2026 WL 2833296, at *11 (N.D.N.Y. Sept. 1, 2026), *adopted by* 2026 WL 2826100 (N.D.N.Y. Sept. 21, 2026).

Even assuming *Craig* governs, the trial court reasonably concluded that the requirements for remote testimony were met. Under *Craig*, "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." 497 U.S. at 850. Protecting witnesses "from physical danger or suffering" may satisfy this standard. *Horn v. Quarterman*, 508 F.3d 306, 320 (5th Cir. 2007); *see also Harrell v. Butterworth*, 251 F.3d 926, 931 (11th Cir. 2001) (finding that a witness's "poor health" is a "public policy consideration[ ]" that may justify "an exception to face-to-face confrontation"). Because *Craig* supplies a "general" rule, state courts have "more leeway . . . in reaching outcomes in case-by-case

determinations." *Parker v. Matthews*, 567 U.S. 37, 48 (2012).

A fairminded jurist could conclude that MacLean's remote testimony was "necessary to further an important public policy." *Craig*, 497 U.S. at 850. The trial court required proof that "travel" would be "more than simply inconvenient" for MacLean. (Respondent's Exhibit 1 at 373) Indeed, the court insisted on evidence that travel would "actually [be] very difficult for her because of her health conditions." (Respondent's Exhibit 1 at 373) MacLean offered concrete reasons for excusing travel — "osteoarthritis," a replaced hip, "incontinence," and "sciatica and back issues" that required "five injections every three months." (Respondent's Exhibit 1 at 381) Delayed treatment could leave her "waiting by the phone" for an opening and, without the injections, she would "just have pain." (Respondent's Exhibit 1 at 383) Also, MacLean cared for her widowed, sixty-three-year-old brother, who had "broken his foot badly," experienced unexplained leg swelling, and required "somebody to be there with him or to drive him somewhere." (Respondent's Exhibit 1 at 384) These circumstances supplied a reasonable basis to conclude that remote testimony was necessary to protect MacLean "from physical danger or suffering" and to allow her to fulfill her caregiving responsibilities. *Horn*, 508 F.3d at 320.

Moreover, a fairminded jurist could conclude that the procedure satisfied *Craig*'s reliability prong. MacLean was placed under oath, defense counsel had an opportunity to cross-examine her, the jury could observe her as she testified, and she could see the jury. (Respondent's Exhibit 1 at 372–73; Respondent's Exhibit 1a

at 238–42, 251–55) "[T]hese assurances of reliability and adversariness" were sufficient to satisfy *Craig*. *Craig*, 497 U.S. at 851; *see also Harrell*, 251 F.3d at 931 (holding that "the reliability prong of the *Craig* analysis was satisfied" because "both witnesses were placed under oath by a court clerk in Miami; [petitioner] had an opportunity to cross-examine the witnesses; the jury could observe the witnesses as they testified; and the witnesses could see the jury").

**<u>Ground Three:</u>**

Pitts argues that the trial court erroneously denied his *Batson*[5] challenge to the peremptory strike of Nayes, the only African American prospective juror. (Doc. 1 at 29–31) During *voir dire*, Nayes disclosed that Celeste Campbell, defense counsel's wife and a courtroom spectator, had taught at her elementary school. (Respondent's Exhibit 1a at 52, 55) Campbell had not taught Nayes, but Nayes knew her "from being a teacher at the school." (Respondent's Exhibit 1a at 56) Wilkes, a white prospective juror, disclosed that she had worked with Campbell at the elementary school approximately fifteen years earlier. (Respondent's Exhibit 1a at 52) Both Nayes and Wilkes denied that their connection to Campbell would affect their ability to be impartial. (Respondent's Exhibit 1a at 52–53, 56)

The prosecutor used peremptory strikes on both Nayes and Wilkes. (Respondent's Exhibit 1a at 125, 127) Asked to explain Nayes's strike, the prosecutor mistakenly stated that Campbell was "a member of the defendant's

---

[5] *Batson v. Kentucky*, 476 U.S. 79 (1986).

family" and expressed concern that the prospective jurors' favorable association with Campbell could cause "unconscious or unintentional bias." (Respondent's Exhibit 1a at 128) Defense counsel immediately clarified that Campbell was his wife. (Respondent's Exhibit 1a at 129) The prosecutor maintained the strike and explained that Nayes's "familiarity with defendant's side of the courtroom" might "sway[ ]" her "in some way." (Respondent's Exhibit 1a at 130–31) According to the prosecutor, "it [was] obvious . . . from the way [Nayes and Wilkes] were speaking about Campbell that they ha[d] very positive associations with her." (Respondent's Exhibit 1a at 138)

The trial court credited this explanation as "genuine" and "race neutral." (Respondent's Exhibit 1a at 139) The court noted that "Wilkes, who is white, was challenged by the State for the exact same reason. Nayes, who happens to be African American, was challenged, and at the time of challenge, I very strongly felt that it was a genuine reason because of knowledge of the defense attorney's wife." (Respondent's Exhibit 1a at 139) Pitts challenged this ruling on direct appeal, and the appellate court affirmed without explanation. (Respondent's Exhibit 2 at 11–12; Respondent's Exhibit 4)

Pitts is entitled to no relief because a fairminded jurist could agree with the rejection of his *Batson* claim.[6] A defendant's "*Batson* challenge to a peremptory strike

[6] Contrary to the respondent's assertion, Pitts properly exhausted his *Batson* claim. (Doc. 7 at 26–27) At trial, counsel objected that Nayes was the "only black juror" and requested a "race-neutral reason" for the peremptory strike. (Respondent's Exhibit 1a at 127–28) When Pitts eventually accepted the jury, the court noted that the *Batson* objection was "preserv[ed]."

(continued…)

requires a three-step inquiry." *Rice v. Collins*, 546 U.S. 333, 338 (2006). First, the trial court "must determine whether the defendant has made a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race." *Rice*, 546 U.S. at 338. Second, "if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question." *Rice*, 546 U.S. at 338. "Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices." *Rice*, 546 U.S. at 338. Third, the court must "determine whether the defendant has carried his burden of proving purposeful discrimination." *Rice*, 546 U.S. at 338. "This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Rice*, 546 U.S. at 338.

Pitts contends that the trial court erred at the third step because the circumstances established "purposeful discrimination by the prosecutor." (Doc. 1 at 30) This argument fails. The court reasonably concluded that the prosecutor's explanation for striking Nayes was "genuine" and "race neutral." (Respondent's Exhibit 1a at 139) A fairminded jurist could credit the concern that Nayes's familiarity with Campbell might incline her toward the defense. *See United States v. Montgomery*, 210 F.3d 446, 453 (5th Cir. 2000) ("[T]he ultimate inquiry for the judge

---

(Respondent's Exhibit 1a at 141) On direct appeal, Pitts cited *Batson* and argued that "[t]he strike should have been disallowed." (Respondent's Exhibit 2 at 12) Thus, Pitts fairly presented the *Batson* claim both at trial and on appeal.

is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based.").

The sincerity of this concern gains force from the prosecutor's treatment of Wilkes, a white prospective juror. Before striking Nayes, the prosecutor had already struck Wilkes because of her connection to Campbell. (Respondent's Exhibit 1a at 125–27) As the court explained, Wilkes was struck "for the exact same reason" as Nayes — her familiarity with defense counsel's wife. (Respondent's Exhibit 1a at 129) A trial court can "measure credibility by considering the offering party's consistency in applying its non-discriminatory justification." *United States v. Howard*, 67 F.4th 876, 883 (7th Cir. 2023); *see also Rice*, 546 U.S. at 341 ("[The prosecutor's] wariness of the young and the rootless could be seen as race neutral, for she used a peremptory strike on a white male juror . . . with the same characteristics [as the African American juror].").

Because a fairminded jurist could agree with the rejection of the *Batson* claim, Pitts is entitled to no relief.[7]

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Pitts claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of

---

[7] The prosecutor's initial confusion about Campbell's relationship to Pitts does not establish a discriminatory purpose. The prosecutor immediately acknowledged the error and explained why she remained concerned — both prospective jurors knew someone "on the defendant's side of the courtroom" whose favorable associations could influence the verdict. (Respondent's Exhibit 1a at 129, 138) Moreover, the prosecutor noted that she had mistakenly assumed Campbell was a member of Pitts's family because she had "seen [Campbell] in court before and [she] associated [Campbell] with [Pitts's] family." (Respondent's Exhibit 1a at 129) The court did not act unreasonably in accepting the prosecutor's explanation of the strike as genuine and race neutral.

ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)). *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains that *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*,
>
>> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances,

the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Pitts must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To meet this burden, Pitts must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

Pitts cannot meet his burden by showing that the avenue chosen by counsel proved unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

Sustaining a claim of ineffective assistance of counsel under Section 2254(d) is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. *See Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) ("Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is

found to merit relief in a federal habeas proceeding.'") (quoting *Johnson v. Sec'y, Dep't Corrs.*, 643 F.3d 907, 911 (11th Cir. 2011)).

In determining "reasonableness," Section 2254(d) authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry" and not independently assessing whether counsel's actions were reasonable. *Putman v. Head*, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001). The presumption of correctness and the highly deferential standard of review require that the analysis of each ground begin with the state court's analysis.

**Ground Four:**

Pitts contends that trial counsel provided ineffective assistance by failing to challenge the "racial composition" of the venire. (Doc. 1 at 32–33) Pitts asserts that only one of forty prospective jurors was African American, a "gross underrepresentation compared to the number of African Americans in the community." (Doc. 1 at 32) Pitts attributes the alleged underrepresentation to "systematic exclusion" in jury selection practices and argues that counsel should have "challenge[d] the jury venire" on this basis. (Doc. 1 at 32–36)

The post-conviction court rejected this claim for lack of prejudice. (Respondent's Exhibit 11 at 233–35) The court noted that "[a] successful ineffective assistance claim based on trial counsel's failure to challenge the racial composition of the jury venire from which the jury is impaneled requires a showing that a defendant was so prejudiced that he was denied a fair trial." (Respondent's Exhibit 11 at 233) As the court pointed out, Pitts "frankly concede[d] that, due to the strength of the

State's evidence at trial, he [could not] prove *Strickland* prejudice." (Respondent's Exhibit 11 at 234) The court summarized the "overwhelming evidence of guilt":

> [T]he State introduced evidence that [law enforcement] placed a tracking device on [Pitts's] vehicle. [Pitts] drove to Sarasota County and several deputies . . . followed him to a residential neighborhood in Venice. [Pitts] was dropped off in the neighborhood and an accomplice, Raymond Corso, drove the vehicle to wait at a nearby McDonald's restaurant. When [Pitts] left the neighborhood, burglaries were immediately identified at two homes and an attempted burglary at a third home. Deputies followed [Pitts] from the neighborhood and stopped his vehicle. [Pitts] was in possession of items stolen in the burglaries and later identified by the owners, including collectible coins found in [Pitts's] pocket. The vehicle's center console contained [a glass punch]. [Pitts's] backpack, also found in the vehicle, contained glass fragments that were forensically matched to glass from the shattered glass sliding doors at one of the burglarized homes. Corso testified that he helped [Pitts] commit the burglaries. His testimony was corroborated by law enforcement surveillance and GPS data.

(Respondent's Exhibit 11 at 234–35)

Because the prosecution presented "overwhelming evidence of guilt," the court found that Pitts "failed to satisfy *Strickland* prejudice regarding trial counsel's performance in relation to the racial composition of the jury venire." (Respondent's Exhibit 11 at 235)

This ruling was reasonable. Pitts contends that he did not need to show prejudice because the alleged "underrepresentation of African Americans on the jury venire amounted to a structural error that tainted the entire trial." (Doc. 9 at 9) But "an ineffective assistance of counsel claim based on the failure to object to a structural error at trial requires proof of prejudice." *Purvis v. Crosby*, 451 F.3d 734,

742 (11th Cir. 2006). "[T]o establish that the failure to raise the structural defect was the result of ineffective assistance, the inept representation . . . must have prejudiced the accused's defense." *Purvis*, 451 F.3d at 742. In other words, Pitts needed to show "a reasonable probability that a different (*e.g.*, properly selected) jury would have reached a different result, a probability sufficient to undermine confidence in the outcome of the trial." *Ambrose v. Booker*, 801 F.3d 567, 578 (6th Cir. 2015); *see also Weaver v. Massachusetts*, 582 U.S. 286, 301, 305 (2017) (requiring proof of prejudice from counsel's failure to object to courtroom closure during jury selection because, despite the error's structural nature, "*Strickland* prejudice is not shown automatically"); *Thomas v. Borg*, 159 F.3d 1147, 1152 (9th Cir. 1998) (rejecting ineffective assistance claim based on failure to challenge racial composition of jury pool "because the evidence, both testimonial and physical, against [petitioner] was so overwhelming that it is hard to believe that any reasonable juror, black or white, would have voted to acquit him").

As the post-conviction court explained, the evidence against Pitts was overwhelming. Consequently, Pitts cannot show "a reasonable probability that a different . . . jury would have reached a different result." *Ambrose*, 801 F.3d at 578. The post-conviction court reasonably found no prejudice from the failure to challenge the racial composition of the venire.

**<u>Ground Five:</u>**

Lastly, Pitts faults trial counsel for failing to present evidence that the "glass punch" found in the Chevrolet Malibu was an "automatic hole punch" he used to

"install ductwork in buildings." (Doc. 1 at 36) According to Pitts, evidence of the tool's "lawful use" would have created "reasonable doubt as to whether [he] used or intended to use the tool to commit the burglaries." (Doc. 1 at 37–38)

The post-conviction court reasonably rejected this claim for lack of prejudice. (Respondent's Exhibit 11 at 237) "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). "Applying AEDPA to *Strickland*'s prejudice standard, [the district court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Pitts] — that there was no substantial likelihood of a different result — was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Pitts cannot meet this demanding standard. The very point Pitts faults counsel for failing to develop — that the tool could have legitimate uses — was squarely before the jury. On cross-examination, the crime-scene analyst admitted that she did not "know all the uses for" the tool recovered from the center console. (Respondent's Exhibit 1a at 461) Asked whether the object was "actually a simple hole punch," the analyst answered, "I do not know." (Respondent's Exhibit 1a at 462) The prosecutor acknowledged in closing, "Of course [the tool] can be used for other things," and reiterated in rebuttal, "I'm sure there's innocent uses for this tool." (Respondent's Exhibit 1a at 632, 667) "[A] petitioner cannot satisfy the

prejudice prong of the *Strickland* test with evidence that is merely cumulative of evidence already presented at trial." *Sochor v. Sec'y Dep't of Corr.*, 685 F.3d 1016, 1032 (11th Cir. 2012).

Moreover, proof that Pitts used the tool at work would not have undermined the substantial evidence connecting the tool to the burglaries on Wexford Drive. Under Florida law, tools with "a useful and lawful purpose[ ] may be classified as burglary tools if they are used with the intent to commit a burglary." *Green v. State*, 604 So. 2d 471, 473 (Fla. 1992). The burglarized homes on Wexford Drive had broken sliding doors, and investigators found "a flashlight, a screwdriver, [and] a glass punch" on the Malibu's center console. (Respondent's Exhibit 1a at 442–43, 451) Also, the back seat of the Malibu held "two large flat screen televisions" taken from 506 Wexford as well as Pitts's backpack, which contained items taken from 511 Wexford. (Respondent's Exhibit 1a at 249–50, 263–68, 448, 451–52) The glass punch was suited to the method of entry used in the burglaries and was recovered from the vehicle that transported the proceeds of the burglaries. These circumstances strongly suggested that Pitts had used the glass punch to break into the homes. On this record, a fairminded jurist could conclude that evidence of another reason Pitts owned the tool would not create a "reasonable probability" that "the outcome at trial would have been different." *Reed*, 767 F.3d at 1261; *see also Fortenberry v. Haley*, 297 F.3d 1213, 1229 (11th Cir. 2002) (finding no prejudice from counsel's failure to present exculpatory testimony because "no reasonable likelihood [existed] that the

jury would have discredited" the "strong evidence" of guilt had the jury heard the omitted testimony).

## V. CONCLUSION

Pitts's application for the writ of habeas corpus (Doc. 1) is **DENIED**. The clerk must enter a judgment against Pitts and **CLOSE** this case.

## CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Because Pitts fails to demonstrate either a substantial showing of the denial of a constitutional right or that reasonable jurists would debate both the merits of the grounds and the procedural issues, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000). Pitts must obtain permission from the court of appeals to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on November 10, 2026.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE